## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | |
|---|---|
| DEMOSTHENESE ANTWYAN WESLEY, ) | CASE NO. 7:18CV00614 |
| ) | |
| **Plaintiff,** ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| WINCHESTER CITY POLICE OFFICER ) | |
| **CONNER MOLLOY,** ) | By: Hon. Glen E. Conrad |
| ) | Senior United States District Judge |
| **Defendant.** ) | |

In this civil rights action under 42 U.S.C. § 1983, the pro se plaintiff, Demosthenese Antwyan Wesley, claims that after his arrest, the defendant police officer planted illegal drugs on him and failed to protect him from excessive force by other law enforcement officials. After review of the record, the court concludes that the defendant is entitled to summary judgment.

I. Background.

The facts concerning Wesley's arrest are largely undisputed. In the early morning hours of February 9, 2018, City of Winchester Police Officer Conner Molloy and a fellow officer, Joshua Avery, questioned Wesley about outstanding criminal charges and conducted a routine search of his person. They found no illegal contraband. They arrested Wesley pursuant to a capias and transported him to the Northwestern Regional Adult Detention Center ("NRADC"). In the sally port area of that facility, the police officers turned over custody of Wesley to NRADC officials, who immediately conducted a second body search of Wesley's person.[1]

---

[1] The court notes that the date of Wesley's arrest and arrival at NRADC is somewhat unclear. Wesley alleges that he was arrested between 1:00 and 2:00 a.m. on February 8, 2018. The date stamps on the video footage clips, the NRADC intake records, and the defendant's affidavits, however, indicate that the date was February 9, 2018. The court does not find this discrepancy material to the disposition of Wesley's claims.

At this point, the parties' accounts diverge. Liberally construed, Wesley's submissions allege that Molloy "interrupted the search by stepping fo[r]ward unravelling his fist which contained an amount of marijuan[a] stating 'This will be a felony.'" Sec. Am. Compl. 3, ECF No. 26. Wesley responded, "That's not mine, you just planted that." Id.

> Unknown [NRADC] officials then began assaulting [Wesley] while screaming stop resisting (which [Wesley] claims he was not) with Officer Connor Molloy still present. Plaintiff Wesley was then dragged to restraining [sic] chair where he was placed for an unknown amount of time.[2] Eventually [a NRADC official] had him released and stated directly to plaintiff Wesley he couldn't and wouldn't be charged with a felony drug charge.

Id. Wesley has sued Molloy under § 1983 for monetary damages, contending that (1) Molloy "intentionally and cruel[l]y planted drugs on [Wesley] . . . provokingly stating felony charges would be filed," and (2) Molloy failed to protect Wesley although he was present when jail officials assaulted Wesley.[3] Id. at 1-2.

In support of Molloy's initial summary judgment motion, he presents his affidavit and surveillance camera video footage of the incident at NRADC. Molloy states that he has been employed as a police officer of the Winchester Police Department ("WPD") since July 2016 and has never been employed as a correctional officer at the NRADC. On February 9, 2018, after NRADC officials took custody of Wesley, Molloy and Avery remained in the sally port area. From

---

[2] In a later unverified pleading, Wesley alleges that he "was isolated in NRADC restraint chair for approxi[mately] two hours or more while under the impression unlawful felony charges w[ere] being processed for drugs that were never of his possession but the possession of an officer of the law." Mot. Am. 2, ECF No. 34.

[3] Upon receiving Wesley's original § 1983 complaint, the court notified him that it failed to allege facts stating any actionable claim and granted him an opportunity to amend it, which Wesley did. In response to the first amended complaint, Molloy filed a motion to dismiss. Wesley responded with a second amended complaint, which the court permitted under Rule 15 of the Federal Rules of Civil Procedure. By opinion and order entered April 30, 2019, the court granted Molloy's motion to dismiss as to Wesley's claim that the officer threatened to have him charged with a drug felony, because no such charge was ever filed. See Wesley v. Molloy, No. 7:18CV00614, 2019 WL 1930133, at *2 (W.D. Va. Apr. 30, 2019). The court denied the motion to dismiss as to Wesley's claim that Molloy "was confronted with the jail officials' wrongful conduct; that he had a reasonable opportunity to intervene to prevent further unreasonable force; and that he chose not to act to protect Wesley." Id. Molloy then moved for summary judgment.

their vantage point in the corner, Wesley "appeared to resist the pat down search by the NRADC [officials], both physically and verbally." Mem. Supp. Mot. Summ. J. Molloy Aff. ¶ 4, ECF No. 30-1.

Molloy has submitted a copy of an incident report by NRADC Sergeant Timbrook about the officers' actions on February 9, 2018, regarding Wesley's intake search. Timbrook states:

> I directed [Wesley] into the pat down area asking him to face the gray pads on the right as we entered. He complied but was in an agitated state. I asked him if he had anything on that was sharp and would poke me, or any drugs on him. He would not respond so I slowly commenced to start the pat down carefully searching his pockets. Sgt. Miller assisted me as well with the pat search. He found a brown paper rolled up with a green leafy substance in his right jacket pocket and handed it over to Officer Avery. At this time [Wesley] started to tense up and begin yelling that he was about ready to spaz out. We completed searching his pockets with him attempting to tense up move about. I reached in and secured a key lock on his left hand gaining control of his hand to clear the lock of the cuff for its removal. The handcuffs were removed and his hands securely placed and maintained on the wall by myself and Officer Largent to allow Sgt. Miller to complete a more thorough pat search of the individual.
>
> Sgt. Miller checked all accessible areas but Wesley still had multiple layers on that restricted access. I reached up under his coat and down his sleeve with my right arm so as to be able to maintain control of his arm as I slid his coat off of his left arm. I then moved the coat over toward Officer Largent for the removal of his side. At this time as Largent was removing his coat he began to resist. I delivered a knee strike to the back if his left hamstring and pinned him to the wall. He attempted to bend over and contort his body to alleviate the pressure of the double key locks placed on him. It was determined to place him on the mat face down to complete the pat search. With the pat search completed the handcuffs were place[d] back on him and double locked per facility S.O.P. He was assisted to his feet Officer Largent and myself. Lt. Saville arrived at that moment and determined that he was to be placed in the restraint chair for the safety and security of himself and the facility.
>
> He was escorted to the restraint chair by myself and Officer Largent with Sgt. Miller controlling the head. He was sat in the chair and his feet were then secured, the left by myself. The handcuff was removed from his left arm and his arm placed in the restraint. The left shoulder restraint was placed on by myself and tightened by Officer Gardner. Nurse Urb checked the restraints for circulation and approved. Inmate Wesley was removed from the chair at 0555 hours and placed in holding cell 3. He was strip searched by Officer Largent and myself due to the green substance found on his person prior.

Mem. Supp. Summ. J. Ex. 3, ECF No. 30-2.[4]

Molloy states that he did not plant drugs on Wesley, that he had no authority (as a nonemployee) to participate or intervene in the NRADC officials' pat down search, and that "it did not appear to [Molloy] that any force used by the NRADC officers was unreasonable under the circumstances, nor did Wesley complain of any injuries. In any event, [Molloy says he] had no reasonable opportunity to act," since he did not see any unreasonable force being used and had no authority to intervene in NRADC's actions with their detainee. Malloy Aff. at ¶¶ 5-6.

Molloy asserts that the video footage provided from NRADC officials appears to depict accurately the intake and pat down search that NRADC officers conducted on Wesley on February 9, 2018. Molloy states that he and Avery can be identified in the video with their names on their uniforms. Molloy reports that he "was not present in the separate room depicted in the video where [Wesley] is shown being placed in a restraint chair by NRADC correctional officers or participate in the NRADC officers' decision to utilize a restraint chair on Wesley" that day. Id. at ¶ 7.

Wesley has filed an unverified response to Molloy's initial motion and affidavit. Wesley repeats his allegation that Molloy interrupted the jail officers' body search to "unlawfully insinuate that [Wesley] had drugs in his possession within jail walls." Resp. 3, ECF No. 37. Wesley also reiterates his allegation that Molloy should have intervened to protect him from the NRADC officers' alleged use of excessive force. Finally, Wesley states that "he may not have sustained physical bodily injury," but suffered "mental anguish" and "corporal punishment" from the "traumatic experience." Id. In his response, Wesley complains that officials at the jail where he

---

[4] The written report contains various typographical errors. The court has quoted from the report as written, rather than correcting each error.

was confined when he received Molloy's motion did not allow Wesley to view the video footage before returning it to the sender.

While Molloy's initial motion for summary judgment was pending, Wesley notified the court that he had been released from confinement. Because Wesley was no longer an inmate, he no longer qualified to continue paying the filing fee, as he had originally agreed, through installments from his trust account. See 28 U.S.C. § 1915(b). Thus, the court assessed filing costs—the $350 filing fee and a $50 administrative fee—and directed Wesley to pay these costs within ten days or otherwise respond to the order. When he failed to do so, the court summarily dismissed the case without prejudice on October 1, 2019, for failure to prosecute.

Later in October 2019, Wesley moved for reconsideration of the dismissal and applied to proceed in forma pauperis. The court granted Wesley's motions and reinstated the case. Thereafter, Molloy renewed his initial motion for summary judgment. In November 2019, the court received a motion from Wesley that it construed as seeking discovery. The magistrate judge granted Wesley's motion to amend to clarify his claim that Molloy planted a bag of marijuana on Wesley on February 9, 2018. She also directed Molloy to provide to Wesley "any available camera footage (*in a format easily used by a lay person*) (a) from the dash cam on Molloy's police vehicle and (b) from the body cams worn by Molloy and his fellow police officer, related to plaintiff's arrest; and (c) the surveillance camera footage from the jail provided by the defendant in support of the summary judgment motion." Order ¶ 4, ECf No. 53 (emphasis in original). The order denied all other discovery requests as too vague and conclusory. On November 21, 2019, Molloy notified the court that all available footage had been sent to Wesley, and to the court, on a thumb

drive to be played on a computer.[5] The court has received no indication that Wesley did not receive or was unable to view the footage.

On November 27, 2019, Molloy filed a supplemental motion for summary judgment, incorporating the evidence and argument from his prior motions and submitting a supplemental affidavit about his review of the video footage. Molloy also states that the video (wesley 2.ave)[6]

> reflects that once custody of Wesley was transferred to NRADC correctional officers at the jail[,] an object which visually and by smell appeared to be a marijuana blunt [sic] was discovered by an NRADC officer during their pat down search of Wesley in the jail sally port intake area. The video footage confirms that the NRADC officer handed the object to WPD fellow Officer Joshua Avery who smelled and then handed the marijuana blunt to me. Neither of us participated in the pat down search of Wesley or seizure of the object from Wesley at the jail.

Brief Supp. Suppl. Mot. Summ. J. Molloy Aff. ¶ 8, ECF No. 57. He states that "[t]he blunt was placed in property and marked for destruction by Officer Avery since no charge was sought by anyone." Id. at ¶ 10.

The court provided Wesley with a notice of Molloy's supplemental motion for summary judgment. The notice expressly warned Wesley:

> . . . The Court will give Plaintiff twenty-one (21) days from the date of this Notice to submit any further counter-affidavits or other relevant evidence contradicting, explaining or avoiding Defendant's evidence. . . .
>
> If Plaintiff does not respond to Defendant's pleadings, the Court will assume that Plaintiff has lost interest in the case, and/or that Plaintiff agrees with what the Defendant states in [his] responsive pleading(s). If Plaintiff wishes to continue with the case, it is necessary that Plaintiff respond in an appropriate fashion. Plaintiff may wish to respond with counter-affidavits or other additional evidence as outlined above. However, if Plaintiff does not file some response within

---

[5] In response to the court's order regarding video footage, Molloy presents the affidavit of the Chief of Police for the WPD, John R. Piper, who states that the WPD does not have dash cameras in its cruisers and that Molloy was not equipped with a body camera in February of 2018. Thus, the WPD has no dash cam or body cam video footage of Wesley's arrest on February 9, 2018. See gen. Resp. Piper Aff., ECF No. 55.

[6] Molloy presents seven separate clips of surveillance footage from NRADC, labeled wesley 1.ave, wesley 2.ave, etc. Viewed sequentially, they depict Wesley's movement on February 9, 2018, from Molloy's cruiser in the NRADC garage, into the sally port where the NRADC conducted their pat down, to the restraint chair, and into his cell.

> the twenty-one (21) day period, the Court may dismiss the case for failure to prosecute.

See Notice, ECF No. 58 (emphasis in original). The time for Wesley to respond to Molloy's supplemental motion has long since elapsed, and he has had no further communication with the court. Thus, the court concludes that Molloy's summary judgment motions are ripe for disposition.

II.

The court should grant summary judgment only when the pleadings and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A genuine dispute of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In considering Molloy's motions for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to Wesley, as the nonmoving party. Id. at 255. To be successful on his motions for summary judgment, Molloy, as the moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky., 93 F.3d 230, 233 (6th Cir. 1996).

When a motion for summary judgment is made and is properly supported by affidavits, the nonmoving party may not rest on the mere allegations or denials of the pleadings. Anderson, 477 U.S. at 256 (citing Fed. R. Civ. P. 56(e)). Instead, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. Id. at 256-57. Where the plaintiff's version of events is so utterly discredited by unchallenged video footage that no reasonable jury could believe him, summary judgment is appropriate. See Scott v.

Harris, 550 U.S. 372, 380-381 (2007) ("The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."); accord Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008) ("[W]here, as here, the record contains an unchallenged videotape capturing the events in question, we must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape.").

The court has viewed the video footage of events at NRADC on February 9, 2018. Molloy confirms its accurate depiction of events in the NRADC sally port that morning, and Wesley has not disputed its accuracy. The video footage (wesley 1.ave) does not reflect that Molloy or Avery placed anything in Wesley's pockets while they escorted him from their police cruiser into the NRADC sally port area at around 3:24 a.m. Moreover, the second clip (wesley 2.ave) does not support Wesley's contentions that Molloy interrupted a search of Wesley's person, that Molloy planted drugs on him during that search, or that Molloy had any reasonable opportunity or authority to protect Wesley from excessive force by NRADC officers who then had custody of the detainee.

On the contrary, the video shows events as Molloy has described them. Inside the sally port, Molloy and Avery stand near the door, while three NRADC officers search Wesley's many layers of clothing. After one officer finds the small object that Molloy has identified as a blunt of marijuana, he hands it to Officer Avery, who smells it, and hands it to Molloy. Avery and Molloy make no contact whatsoever with Wesley at any time. Several minutes into the search, Wesley visibly becomes agitated and appears to begin shouting and physically resisting the NRADC officers' efforts to remove his clothing items and keep him under control. Ultimately, because of his continued resistance movements, the officers force him to lie flat on the floor to remove his outer pair of pants.

When the search is complete, at about 3:30 a.m., Wesley is dressed in a dark tee-shirt and dark pants. The NRADC officers help him stand in a bent-forward position and escort him through a door, while Molloy and Avery remain behind in the sally port. The NRADC officers move Wesley across a lobby area (wesley 3.ave) and on into a separate room containing the restraint chair (wesley 4.ave). After Wesley is placed in the chair, he appears to sleep fitfully. At about 5:50 a.m., officers release Wesley from the chair. He walks calmly between two officers, without any restraints, to a cell, where he covers himself with a blanket and lies down on the mattress.

Again, the video does not indicate that Molloy participated in or interrupted the NRADC officers' search and struggle to control the combative Wesley in the sally port area. The video does not depict any NRADC officer using force against Wesley except to keep him under control to complete the search, remove his outer clothing, and escort him safely into the facility. The video also does not show any physical injuries on Wesley's person at the end of these events.

The court concludes that Molloy is entitled to summary judgment. Wesley's evidence consists of unsworn allegations about events in the sally port that are so utterly discredited by unchallenged video footage that no reasonable jury could believe him. In short, the record does not present any genuine issue of disputed fact on which Wesley could persuade jurors to find in his favor on his claims that Molloy planted drugs on him or failed to protect him from the use of excessive force by an NRADC officer. Therefore, the court must grant the motions for summary judgment. An appropriate order will issue this day.

The clerk will send a copy of this memorandum opinion and the accompanying order to Wesley and to counsel of record for the defendant.

**ENTER**: This __12th__ day of August, 2020.

_/s/ Glen Conrad_
Senior United States District Judge